## UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MARY ANN SHOEMAKER and CLYDE SHOEMAKER, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>PAUL GERAGHTY, LEEANN BERGEY, BRENT PETERS, HAROLD HERR, JAMES WIMMER, STEPHANIE MITCHELL, THOMAS LEAMER, A. ROSS MYERS, JAMES MCERLANE, JOHN CUNNINGHAM, WALTER DALLER, DEMETRA TAKES, HARLEYSVILLE NATIONAL CORPORATION, and FIRST NIAGARA FINANCIAL GROUP INC.,<br><br>Defendants. | CASE NO.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED**<br><br>FILED<br>JAN 15 2010<br>by _____ Dep. Clerk |

Plaintiffs, by their attorneys, allege upon information and belief, except for their own acts, which are alleged on knowledge, as follows:

### NATURE OF THE ACTION

1. Plaintiffs bring this action on behalf of the public stockholders of Harleysville National Corporation ("Harleysville" or the "Company") and on behalf of Harleysville against Defendants, Harleysville and its Board of Directors (the "Individual Defendants") alleging violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 14a-9 promulgated thereunder by the United States Securities and Exchange Commission ("SEC").

2. Specifically, the Individual Defendants have attempted to solicit shareholder proxies with the issuance of a Schedule 14A Proxy Statement (the "Proxy") on December 17, 2009 that contains materially misleading information and omissions of material fact in support of the Company's proposed sale to Defendant First Niagara Financial Group, Inc. ("First Niagara") whereby Harleysville shareholders will receive 0.474 shares of First Niagara common stock for each share of Harleysville common stock (the "Proposed Transaction").

3. Accordingly, this action seeks to enjoin the Proposed Transaction and require Defendants to disseminate an accurate and complete Proxy prior to the shareholder vote scheduled for January 22, 2010 that fully and fairly informs shareholders all material information in a non-misleading manner.

## JURISDICTION AND VENNUE

4. The claims asserted herein arise under Section 14(a) of the Exchange Act. This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa] and 28 U.S.C. § 1331.

5. Venue is proper in this district because many of the acts and practices complained of herein occurred in substantial part in this district, including the dissemination of the materially misleading statements and omissions alleged herein. In addition, HNBC maintains its principal executive offices in Pennsylvania.

## PARTIES

6. Plaintiffs are, and have been at all relevant times, the owners of shares of common stock of Harleysville.

7. Harleysville is a corporation organized and existing under the laws of the State of Pennsylvania. It maintains its principal corporate offices at 483 Main Street, Harleysville, PA

19438 and operates as the holding company for Harleysville National Bank and Trust Company that provides banking and financial products and services to individual and corporate customers primarily in eastern Pennsylvania. It engages in commercial banking and trust business, including accepting time, demand, savings, and money market deposits; making secured and unsecured commercial, consumer, and real estate loans, as well as financing commercial transactions; making construction and mortgage loans; and performing corporate pension and personal investment, and trust services, as well as provides investment management services. The Company, through its other subsidiaries, also provides reinsurance services to consumer loan credit life, and accident and health insurance, as well as offers investment advisory services in estate and succession planning, and life insurance for high-net-worth construction and aggregate business owners, wealthy families, and institutional clients. As of December 31, 2008, it had 85 branch offices located in Montgomery, Bucks, Chester, Berks, Carbon, Lehigh, Monroe, Northampton, and Philadelphia counties in Pennsylvania.

8. Defendant Paul Geraghty ("Geraghty") has been the President, Chief Executive Officer, and a Director of the Company since 2007.

9. Defendant LeeAnn Bergey ("Bergey") has been a Director of the Company since 1999.

10. Defendant Brent Peters ("Peters") has been a Director of the Company since 2008.

11. Defendant Harold Herr ("Herr") has been a Director of the Company since 1987.

12. Defendant James Wimmer ("Wimmer") has been a Director of the Company since 2008.

13. Defendant Stephanie Mitchell ("Mitchell") has been a Director of the Company since 2002.

14. Defendant Thomas Leamer ("Leamer") has been a Director of the Company since 2003.

15. Defendant A. Ross Myers ("Myers") has been a Director of the Company since 2006.

16. Defendant James McErlane ("McErlane") has been a Director of the Company since 2008.

17. Defendant John Cunningham ("Cunningham") has been a Director of the Company since 2008.

18. Defendant Walter Daller ("Daller") has been the Chairman of the Board of the Company since 2005.

19. Defendant Demetra Takes ("Takes") has been the Chairman of the Board of the Company since 2007.

20. Defendants referenced in ¶¶ 8 through 19 are collectively referred to as Individual Defendants and/or the Harleysville Board. The Individual Defendants as officers and/or directors of Harleysville, have a fiduciary relationship with Plaintiff and other public shareholders of Harleysville and owe them the highest obligations of good faith, fair dealing, loyalty and due care.

21. Defendant First Niagara is a Delaware Corporation with its headquarters located at 6950 South Transit Road, P.O. Box 514, Lockport, NY 14095 that operates as the holding company for First Niagara Bank that provides retail and commercial banking, and financial services to individuals, families, and businesses.

## CLASS ACTION ALLEGATIONS

22.  Plaintiffs bring this action on their own behalf and as a class action on behalf of all owners of Harleysville common stock and their successors in interest, except Defendants and their affiliates (the "Class").

23.  This action is properly maintainable as a class action for the following reasons:

(a)  the Class is so numerous that joinder of all members is impracticable. As of July 27, 2009, Harleysville has approximately 43.11 million shares outstanding.

(b)  questions of law and fact are common to the Class, including, inter alia, the following:

   (i)  Have the Individual Defendants misrepresented and omitted material facts in violation of Section 14(a) of the Exchange Act;

   (ii)  Is the Class entitled to injunctive relief as a result of Defendants' wrongful conduct.

(c)  Plaintiffs are committed to prosecuting this action and have retained competent counsel experienced in litigation of this nature.

(d)  Plaintiffs' claims are typical of those of the other members of the Class.

(e)  Plaintiffs have no interests that are adverse to the Class.

(f)  The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications for individual members of the Class and of establishing incompatible standards of conduct for Defendants.

(g)  Conflicting adjudications for individual members of the Class might as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

## SUBSTANTIVE ALLEGATIONS

24.     In a press release dated July 26, 2009, the Company announced that it had entered into a merger agreement with First Niagara, whereby First Niagara has agreed to acquire HNBC for 0.474 shares of First Niagara common stock for each share of HNBC stock:

> Buffalo, New York—July 27, 2009 — The boards of directors of First Niagara Financial Group, Inc. (NASDAQ: FNFG) and Harleysville National Corporation (NASDAQ: HNBC) announced that First Niagara has agreed to acquire the Philadelphia-area financial services company in an all-stock transaction valued at approximately $237 million or $5.50 per share.
>
> The acquisition of the Harleysville-headquartered bank will provide First Niagara with $5.6 billion in assets including, $3.6 billion in loans and $4.1 billion in deposits in 83 bank branches across nine Eastern Pennsylvania counties. The parent company of Harleysville National Bank also operates East Penn Bank, Millennium Wealth Management and Cornerstone Companies.
>
> The companies signed a definitive purchase agreement for the transaction, which is expected to close in the first quarter of 2010 and be accretive to First Niagara diluted earnings per share by approximately 14% in 2011.

25.     On December 17, 2009, the Company filed the Proxy with the SEC in connection with the Proposed Transaction.

26.     The Proxy fails to provide the Company's shareholders with material information and/or provides them with materially misleading information thereby rendering the shareholders unable to make an informed decision on whether to vote in favor of the Proposed Transaction.

27.     For example, the Proxy completely fails to disclose the underlying methodologies, projections, key inputs and multiples relied upon and observed by JPMorgan Securities, Inc. ("JP Morgan") ("JP Morgan"), the Company's financial advisor, so that shareholders can properly assess the credibility of the various analyses performed by JP Morgan and relied upon by the

Board in recommending the Proposed Transaction. In particular, the Proxy is deficient and should provide, *inter alia*, the following:

(i) The financial projections and forecasts of the Company relied upon by JP Morgan in rendering its fairness opinion. In addition, the Proxy states that JP Morgan relied on "financial analyses and forecasts provided to it by [Harleysville] *or derived therefrom*," but it fails to disclose with specificity what was "derived" and by whom.

(ii) The financial projections and forecasts of First Niagara relied upon by JP Morgan in rendering its fairness opinion.

(iii) The criteria utilized by JP Morgan to select the companies and the multiples used in its *Selected Companies Analysis* of Harleysville, as well as the criteria used to select the "primary peer" companies.

(iv) The multiples observed for each company (or at least the multiples observed for the primary peer companies) in the *Selected Companies Analysis* of Harleysville.

(v) Harleysville's 2009 EPS, 2010 EPS, Book Value and Tangible Book Value used in the *Selected Companies Analysis* of Harleysville.

(vi) The criteria utilized by JP Morgan to select the transactions and the multiples used in its *Selected Transaction Analysis* of Harleysville.

(vii) The multiples observed for each transaction in the *Selected Transaction Analysis* and the reference range and criteria used to select such range that was applied to Harleysville's corresponding financial data for each multiple to calculate the implied valuation per share.

(viii) The criteria used to select 5% long-term earnings growth rate; 5% asset growth rate; a terminal value multiple range of 9.0x to 11.0x; a discount rate range of 12.0% to 14.0%; and additional loan loss provisions between 0 and $150 million used in the *Stand Alone Dividend Discount Analysis* of Harleysville.

(ix) The criteria utilized by JP Morgan to select the companies and the multiples used in its *Selected Companies Analysis* of First Niagara.

(x) The multiples observed for each company in the *Selected Companies Analysis* of First Niagara.

    (xi)    The criteria used to select 7% to 9% long-term earnings growth rates; 5% asset growth rate; a terminal value multiple range of 11.0x to 13.0x; and a discount rate range of 10.0% to 12.0% in the *Stand Alone Dividend Discount Analysis* of First Niagara.

    (xii)    The assumptions and criteria used to calculate annual synergies of $15 million used in the *Pro Form Analysis*.

28. Further, the Proxy omits material information regarding the financial advisor retained in connection with the Proposed Transaction. Specifically, the Proxy states that JP Morgan was retained as the Company's financial advisor in the Proposed Transaction but fails to inform the shareholders the (i) criteria used for selecting JP Morgan, (ii) which other investment advisors (if any) were considered, and (iii) the amount of compensation received by JP Morgan for services performed to Harleysville and First Niagara in the past. It is material for shareholders to be informed as to why the Board selected JP Morgan as well as any other financial and economic interests JP Morgan or its clients have in the Proposed Transaction or in the parties involved that could be perceived or create a conflict of interest.

29. The Proxy also fails to describe material information concerning the process and criteria JP Morgan utilized to identify potential partners as well as discussions and negotiations with potential partners. For example, the Proxy:

    (i)    Fails to disclose the criteria used by JP Morgan to select the 16 private-equity investors contacted beginning in May 2009.

    (ii)    Fails to disclose the value of the four indications of interest received from private equity investors in May-June, 2009.

    (iii)    States that in June 2009, "representatives of JP Morgan discussed each of these indications of interest with" the Harleysville Board, but fails to disclose the results of such discussions.

    (iv)    Fails to disclose the value of Investor X's indication of interest and the amount of the termination fee in Investor X's term sheet.

(v)   Fails to disclose the reasons the Company did not negotiate with each of the three investors that comprised Investor X individually, considering each had originally submitted separate indications of interest, but rather negotiated with them as a group.

(vi)  Fails to disclose whether the Company and/or JP Morgan had any discussions and negotiations with Investor X following July 10, 2009.

(vii) Fails to disclose the reasons the Company waited until July 2009 before authorizing JP Morgan to search for strategic partners.

(viii) Fails to disclose the criteria used to select the nine financial institutions that were contacted in July 2009.

(ix)  Fails to disclose the value and form of consideration of the three indications of interest received from financial institutions.

(x)   Fails to disclose the extent of the discussions and negotiations with the financial institution that proposed an offer with a high range that was 25% above First Niagara's offer, and at what point did such discussions and negotiations cease.

(xi)  States that on July 23, 2009, the Board "engaged in extensive discussion of…the various potential financial institution acquirers" but it fails to disclose the results of such discussion and what was determined with respect to each potential acquirer.

(xii) Fails to disclose whether any of the other indications of interest had a downward adjustment mechanism similar to that of First Niagara's, and whether the Board considered the downward adjustment mechanism in First Niagara's offer when comparing its offer to the other indications of interest.

(xiii) States that on July 23, 2009, the Board instructed its management and JP Morgan to "continue to pursue aggressively other available alternative transactions or potential acquirers" but fails to disclose the actions that were taken to pursue such transactions.

It is absolutely necessary for shareholders to receive a Proxy that provides all material disclosures related to the sales process in order for shareholders to be able to cast a fully informed decision regarding the Proposed Transaction.

30. The Proxy further neglects to provide shareholders with sufficient information to evaluate the pros and cons associated with the other strategic alternatives, other than the sale of the Company, considered by the Company -- information which is vital to shareholders in deciding how to vote regarding the Proposed Transaction. For example, the Proxy states that on June 8, 2009 the Company announced strategic initiatives, including "executing potential asset sales, repositioning Harleysville National Corporation's balance sheet and restructuring funding sources," but it fails to disclose the steps undertaken, if any, to pursue such alternatives, and what was determined with respect to pursuing each alternative.

### Preclusive Deal Protection Devices

31. The Merger Agreement contains certain provisions that unduly benefit the purchasing Defendants by making an alternative transaction either prohibitively expensive or otherwise impossible. As part of the Merger Agreement, Defendants agreed to certain onerous and preclusive deal protection devices that operate conjunctively to make the Proposed Transaction a *fait d'accompli* and ensure that no competing offers will emerge for the Company. The Proxy fails to adequately explain the rationale behind these burdensome deal preclusion devices.

32. First, the Merger Agreement contains a strict "no shop" provision prohibiting the members of the Harleysville Board from taking any affirmative action to comply with their fiduciary duties, including soliciting proposals relating to alternative tender offer or business combinations. The Merger Agreement also includes a strict "standstill" provision which prohibits, except under extremely limited circumstances, the Defendants from even engaging in discussions or negotiations relating to alternative business combinations. In addition to the "no shop" and "standstill" provisions, the Merger Agreement includes a $10,000,000 termination fee should the Board choose to accept a superior deal. The termination fee in combination with the

preclusive deal protection devices will all but ensure that no competing offer will be forthcoming.

33. Section 6.10 of the Merger Agreement severely restricts the Board's ability to enter into discussions and negotiations involving a competing unsolicited bid requiring the Board to (i) determine after consulting with the Company's outside legal counsel and financial advisors that the competing bid would reasonably be expected to result in a superior proposal; (ii) determine that the failure to take such action would violate its fiduciary duties; (iii) give First Niagara notice to the effect that the Company entering into discussions or negotiations with another bidder; (iv) receives from the bidder an executed confidentiality agreement; and (v) keep First Niagara informed, on a current basis, of the status of any discussions or negotiations with other bidders.

34. Further, Section 6.10(e) provides a limited exception under which the Board may recommend an alternative acquisition proposal, requiring the Board to (i) provide First Niagara with written notice that the Company has received a superior proposal, and (ii) provide First Niagara with a 3 business days period during which the Company is required to negotiate in good faith with First Niagara so that First Niagara may propose a modification to the Merger Agreement for the purpose of causing the alternative acquisition proposal to no longer be a superior proposal. These provisions further discourage bidders from making a competing bid for the Company.

35. Thus, even if the Harleysville Board receives an intervening bid that appeared to be "superior" to First Niagara's offer, they are precluded from even entering into discussions and negotiations unless they first reasonably determine in good faith that the alternative proposal is, in fact, "superior." Consequently, this provision prevents the Harleysville Board from exercising

their fiduciary duties and precludes an investigation into competing proposals unless, as a prerequisite, the majority of the Harleysville Board first determines that the proposal is superior.

36. In addition to the unreasonably high standard that must be met for the Board to even consider a competing bid, the Company must also notify First Niagara promptly before recommending to accept that alternative bid, giving First Niagara an opportunity to match the terms of any competing bid. Obviously, no potential bidder will waste time and resources to make a competing bid that First Niagara can simply match.

37. Additionally, on December 7, 2009, Harleysville and First Niagara entered into a Pledge Security Agreement First Niagara agreed to loan the Company up to $50 million. The first installment of the loan was for $35 million and was contributed to Harleysville as Tier One capital. The loan is secured by a pledge of all of the stock of the Company.

## CLAIM FOR RELIEF

### COUNT I
### Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder

38. Plaintiffs repeat all previous allegations as if set forth in full herein.

39. Defendants have issued the Proxy with the intention of soliciting shareholder support of the Proposed Transaction.

40. Rule 14a-9, promulgated by SEC pursuant to Section 14(a) of the Exchange Act provides that a proxy statement shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

41. Specifically, the Proxy violates the Section 14(a) and Rule 14a-9 because it omits material facts, including those set forth above. Moreover, in the exercise of reasonable care,

Defendants should have known that the Proxy is materially misleading and omits material facts that are necessary to render them non-misleading.

42.   The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, and Plaintiff and the Class will be deprived of their entitlement to cast a fully informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.

## PRAYER

**WHEREFORE**, Plaintiffs demand judgment against Defendants jointly and severally, as follows:

(A)   declaring this action to be a class action and certifying Plaintiff as the Class representatives and their counsel as Class counsel;

(B)   declaring that the Proxy is materially misleading and contains omissions of material fact in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

(C)   enjoining, preliminarily and permanently, the Proposed Transaction until Defendants remedy the Proxy's material deficiencies and otherwise render the statements contained therein complete and non-misleading;

(D)   awarding Plaintiffs the costs of this action, including a reasonable allowance for the fees and expenses of Plaintiffs attorneys and experts; and

(E)   granting Plaintiffs and the other members of the Class such further relief as the Court deems just and proper.

Dated: January 15, 2010

                                      Respectfully submitted,

                                      **BRODSKY & SMITH, LLC**

                                      By:_____
                                      Jason L. Brodsky, Esquire
                                      Marc L. Ackerman, Esquire
                                      Two Bala Plaza, Suite 602
                                      Bala Cynwyd, PA 19004
                                      (610) 667-6200
                                      (610) 667-9029 (facsimile)

**OF COUNSEL**

**LEVI & KORSINSKY, LLP**
Joseph Levi, Esquire
W. Scott Holleman, Esquire
30 Broad Street, 15th Floor
New York, New York 10004

**RIGRODSKY & LONG, P.A.**
Seth Rigrodsky, Esquire
919 North Market Street, Suite 980
Wilmington, DE 19801

14